Case: 1:08-cr-00932 Document #: 1 Filed: 11/14/08 Page 1 of 14 PageID #:1

AUSA Maribel Fernandez-Harvath; (312) 353-4129
AUSA Halley Guren, (312) 886-4156

## UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

MARIA GEORGE, aka "Boo"

FILED

NOV 1 4 2008
November 14, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNDER SEAL**

CRIMINAL COMPLAINT

CASE NUMBER

08 CR 932

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __October 19, 2006__ in __Cook__ county, in the __Northern__ District of __Illinois__ defendant,

knowingly and intentionally distributed a controlled substance, namely in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title __21__ United States Code, Section __841(a)(1)__.

I further state that I am a __Special Agent with the Bureau of Alcohol, Tobacco, and Firearms__ and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: _X_ Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

November 14, 2008                                at      Chicago, Illinois
Date                                                     City and State

SUSAN E. COX, U.S. Magistrate Judge              _____ 2:20 pm
Name & Title of Judicial Officer                  Signature of Judicial Officer

STATE OF ILLINOIS   )
                    )
COUNTY OF COOK      )

## AFFIDAVIT

I, Laurie A. Jolley, after being duly sworn, state as follows:

1. I am a Special Agent (SA) of the Bureau of Alcohol, Tobacco and Firearms (ATF), United States Department of Justice. I am currently assigned to the Chicago Group III Gang Investigation Group, Chicago Field Division and have been employed as a Special Agent with ATF for the last twenty years. As part of my official duties, I investigate criminal violations of the federal narcotics and firearms laws, including, but not limited to, Title 21, United States Code, Sections 841 and 846 and Title 18, United States Code, Section 924(c). I have received special training in the enforcement of laws concerning controlled substances and gang activity. I have also been involved in various types of electronic surveillance, in the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution of controlled substances.

2. The following information is based upon my personal observations, knowledge and information I received from other federal law enforcement officers, as well as from cooperating witnesses who have proven reliable and provided information which has been independently corroborated, as set forth in part herein.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of an arrest warrant and a complaint charging MARIA GEORGE, also known as "Boo," with violations of Title 21, United States Code, Section 841(a)(1), it does not contain all the information known to me concerning this investigation.

**September 10, 2006 undercover meeting**

4.  In September 2006, a cooperating witness ("CW1"), agreed to cooperate with law enforcement following his/her release from prison. CW1 is a former member of the New Breed Black Gangster street gang (hereinafter referred to as the "New Breeds"). Prior to his/her incarceration, CW1 had been a member of the New Breeds for years. CW1's criminal history includes a conviction for murder. To date, CW1 has been paid approximately $8,000 for his/her assistance in this investigation. During an initial debrief of CW1 following his/her decision to cooperate, CW1 identified Individual A as a key figure and leader of the New Breeds. CW1 further reported that MARIA GEORGE was a close associate of Individual A's and that she played an important role in the gang's drug operations. Based on his/her years as a member of the New Breeds, CW1 told law enforcement he/she has known both GEORGE and Individual A for over twenty years. The information provided by CW1 during this investigation has been corroborated by independent investigation that included physical surveillance, consensually-recorded telephone calls, and sources of information in the Illinois Department of Corrections.

5.  On or about September 10, 2006, CW1 had an unrecorded telephone conversation with GEORGE in which CW1 requested that GEORGE arrange a meeting between herself, Individual A and CW1. CW1 reported to the ATF that he/she told GEORGE the purpose of this meeting was to get a "blessing," or permission, from Individual A to become actively involved in drug sales. Based on my training as well as my participation in this investigation into the New Breeds, I am aware that Individual A, as one of the top leaders of the gang, has the authority to allow individuals to sell drugs within New Breed controlled territory. CW1 further reported he/she explained to GEORGE that he/she needed a source for the drugs.

2

6. On or about September 12, 2006, at approximately 12:00 p.m., CW1 had another unrecorded telephone conversation with GEORGE. During this conversation, GEORGE told CW1 that she would arrange a meeting between herself, Individual A, and CW1 for later that afternoon. In another unrecorded call later that afternoon, GEORGE confirmed that this meeting had been arranged and would take place at the Home Run Inn, a restaurant located on 31st Street in Chicago, Illinois.

7. Following the unrecorded conversations on September 12, 2006, the ATF made plans for CW to consensually record the meeting between CW1, GEORGE, and Individual A at the Home Run Inn that day. Before CW1 met with GEORGE and Individual A, agents of the ATF searched CW1 for the presence of money, firearms, and narcotics. This search was negative. In addition, agents equipped CW1 with a concealed recording and video device. Following this, I personally drove CW1 to the area around the Home Run Inn and dropped him/her off, allowing him/her to proceed on foot a short distance to the location. Agents of the ATF performing surveillance ("surveillance") watched CW1 as he/she walked to the restaurant. Other ATF agents were positioned inside the Home Run Inn to act as inside cover and surveillance. At approximately 3:00 p.m., CW1, GEORGE, and Individual A met at the Home Run Inn. During the consensually recorded conversation that took place inside the restaurant, CW1 told GEORGE and Individual A he/she was "hurting" for money and needed assistance in getting involved once again in the drug trade. GEORGE, who participated in this conversation, told CW1, if he/she wanted to sell drugs, "we can do something." Individual A told CW1 that CW1 had his blessing to engage in drug sales and directed CW1 to contact GEORGE when CW1 was ready to make a purchase. GEORGE and Individual A also informed CW1 that they would charge him/her $600 for an ounce of cocaine.

### September 20, 2006 Transaction

8. On or about September 19, 2006, CW1 had an unrecorded telephone contact with GEORGE. In this conversation, CW1 told GEORGE he/she would be coming to Chicago the following day and that he/she wanted to purchase one ounce of crack cocaine. GEORGE told CW1 this amount of crack cocaine would not be a problem and CW1 should call her back when he/she arrived in town.

9. On September 20, 2006, at approximately 2:00 p.m., CW1 placed a consensually recorded call to GEORGE. During this conversation, CW1 told GEORGE he/she was in Chicago and ready to purchase the one ounce of crack cocaine. GEORGE and CW1 agreed to meet in a strip mall parking lot in the area of 87th Street and the Dan Ryan Expressway in Chicago.

10. As a result of these conversations, CW1 had a consensually recorded face-to-face conversation with GEORGE at the strip mall parking lot. Before CW1 met with GEORGE, agents of the ATF searched CW1 for the presence of money, firearms, and narcotics. This search was negative. In addition, agents equipped CW1 with a concealed recording and video device and they provided CW1 with $600 in previously recorded buy money.

11. On September 20, 2006, at approximately 4:20 p.m., I personally drove CW1 to the strip mall parking lot in my undercover vehicle. Minutes after arriving, a dark colored Buick driven by an African-American man with an African-American female sitting in the front passenger seat pulled along side my undercover car. CW1 quickly identified the woman in the passenger seat as GEORGE. CW1 exited my undercover car and entered the rear seat of the Buick. Once inside the Buick, GEORGE handed CW1 a plastic baggie containing an amount of suspect crack cocaine. During the in-person meeting, CW1 asked GEORGE what he/she could expect his/her profits to be

from selling the ounce of crack cocaine if he/she was to "bag it up" into small quantities. GEORGE asked CW1 if he/she had not been given some instruction on packaging drugs from other people. CW1 told GEORGE he/she had, but CW1 wanted to make sure he/she had been given accurate instruction on how to sell the cocaine.

12. The male driver of GEORGE's vehicle then told CW1 he/she should make individual bags weighing no more than .5 grams. The driver asked CW1 if he/she had a scale available to check his/her accuracy when bagging up the drugs. GEORGE told CW1 he/she should make the bags himself/herself and that way CW1 would have a better idea on how much to charge for each package. GEORGE also told CW1 the price CW1 should charge for his/her individual bags of crack would depend on the area CW1 would be selling them, explaining that some areas could bring higher prices depending on the availability and demand. The driver of the car then told CW1 he/she should be making a profit of at least $1000 on the sale of the ounce.

13. After receiving the baggie of suspect crack cocaine, I saw CW1 hand $600 in pre-recorded buy funds to GEORGE. CW1 told GEORGE he/she expected to be back to make a further purchase of an additional one to two ounces of crack cocaine in a few days after CW1 had completed selling the first ounce. CW1 then got out of GEORGE's vehicle and re-entered my undercover car, which had remained parked only a few feet away. Once inside, CW1 immediately gave me a clear plastic baggie containing a tan colored chunky substance. Based on my training and experience, this substance had the same characteristics of what I know to be crack cocaine.

14. Following the transaction, I drove CW1 back to a pre-arranged meeting location. At the meeting location, CW1 was again searched for the presence of money, firearms, and narcotics. Those searches were negative.

15. The suspect crack cocaine delivered to CW1 by GEORGE on September 20, 2006 was subsequently analyzed and weighed by a chemist at the North Central Laboratory of the Drug Enforcement Administration (DEA) (hereinafter the "DEA Laboratory"). The suspect crack cocaine tested positive for the presence of cocaine base with a net weight of approximately 27.3 grams. The suspect crack cocaine contained sodium bicarbonate.

**October 10, 2006 Transaction**

16. On or about October 9, 2006, CW1 had an unrecorded telephone conversation with GEORGE in which CW1 arranged to purchase two ounces of crack cocaine from GEORGE. The transaction was set for the next day.

17. On or about October 10, 2006, at approximately 9:00 a.m., CW1 placed another call to GEORGE, which was not recorded. During this conversation, CW1 told GEORGE he/she was en route to Chicago and could meet with GEORGE at the same strip mall parking lot where the September 20, 2006 transaction had taken place. GEORGE told CW1 to contact her again when CW1 was in the immediate area.

18. As a result of these telephone conversations, arrangements were made to have CW1 make a second crack cocaine purchase from GEORGE. Before CW1 met with GEORGE, agents of the ATF searched CW1 and his/her vehicle for the presence of money, firearms, and narcotics. This search was negative. In addition, agents equipped CW1 with a concealed recording and video device and they provided CW1 with $1,200 in previously recorded buy money. CW1 was then kept under surveillance by law enforcement as CW1 drove from the staging area to the strip mall parking lot. Upon arriving, law enforcement directed CW1 where he/she should park his car in the lot. Law enforcement also instructed CW1 to call GEORGE and advise her CW1 was at the meet location and

ready to do business. Because CW1 was equipped with a body recording device, law enforcement was able to hear CW1's side of this conversation.

19. At approximately 4:00 p.m., CW1 placed a call to GEORGE's phone, which was not recorded. During this conversation, GEORGE told CW1 that he/she had taken too long to arrive at the parking lot and the two ounces of crack cocaine she had to sell CW1 had been returned to "the safe house in the Village." GEORGE told CW1 she would attempt to contact her source to determine if she could get the ounces back to sell to CW1. GEORGE told CW1 to remain at the meet location until he/she heard back from her.

20. For nearly the next two hours, CW1 had repeated telephone contact with GEORGE. GEORGE continued to tell CW1 she was attempting to get the two ounces of crack cocaine back and that CW1 should continue to wait for her to obtain it.

21. At approximately 6:19 p.m., CW1 received an incoming telephone call from GEORGE, which was not recorded. During this conversation, GEORGE instructed CW1 to travel from his/her current location to the area of 79th and King Drive in Chicago. Minutes later, ATF surveillance followed CW1 from the parking lot to this new meet location.

22. At approximately 6:36 p.m., surveillance saw CW1 arrive at a McDonald's restaurant parking lot near the intersection of 79th and King Drive. CW1 pulled his/her vehicle into a parking space at the far end of the lot. Surveillance maintained visual contact on CW1 and his/her vehicle during this entire time. Parked next to CW1's vehicle was a black Chevrolet Caprice. Surveillance saw GEORGE exit the Caprice and then stand next to CW1's car. GEORGE then handed CW1 a clear plastic baggie containing what appeared to be an off-white substance. CW1 took the bag from GEORGE and commented that "all her shit looked decent." After CW1 received the drugs from

GEORGE, CW1 handed GEORGE $1,200 in pre-recorded buy funds. Shortly thereafter, GEORGE told CW1 she would meet him/her "halfway" the next time CW1 wanted to make a purchase.

23. After the transaction was complete, CW1 left the McDonald's parking lot and returned, under the surveillance of law enforcement, to the pre-arranged staging area and turned over the suspect crack cocaine to agents. The suspect crack cocaine was chunky. Based on my training and experience, this substance had the same characteristics of what I know to be crack cocaine. In addition, CW1 and his/her vehicle were searched for the presence of money, firearms, and narcotics. Those searches were negative.

24. The suspect crack cocaine delivered to CW1 by GEORGE on October 10, 2006 was subsequently analyzed and weighed by the DEA Laboratory. The suspect crack cocaine tested positive for the presence of cocaine base with a net weight of approximately 40.8 grams. The suspect crack cocaine contained sodium bicarbonate.

**October 11, 2006 Telephone Conversation**

25. On or about October 11, 2006, CW1 had a consensually recorded telephone conversation with GEORGE in which CW1 told GEORGE he/she had weighed the crack cocaine purchased from her the previous day and found that the amount of crack cocaine was "short" [referring to the two ounces of crack cocaine CW1 had ordered]. GEORGE told CW1 to get an exact weight and call her right back. In a second recorded telephone call only minutes later, CW1 told GEORGE the weight was "43," meaning 43 grams. GEORGE responded, "Hell no." GEORGE then told CW1 she would make up for the shortage when CW1 made his next purchase. GEORGE told CW1 that she did not believe the last amount of crack she sold to CW1 could have been more than 6 or 7 grams short. CW1 then asked GEORGE if she could contact Individual A on CW1's

behalf and explain he/she wanted to speak to Individual A again in person to discuss purchasing larger quantities of crack cocaine. GEORGE assured CW1 she would arrange this meeting.

**October 19, 2006 Transaction**

26. On or about October 18, 2006, CW1 had an unrecorded telephone conversation with GEORGE in which CW1 arranged to purchase four ounces of crack cocaine from GEORGE. The transaction was set for the next day.

27. On or about October 19, 2006, in the morning hours, CW1 reported to agents about receiving an incoming telephone call from GEORGE, which was not recorded. During this conversation, CW1 told GEORGE about his/her plans to come to Chicago later that morning. CW1 told GEORGE he/she anticipated being around the same strip mall parking lot discussed above around noon that day. GEORGE responded that she did not want to meet at that location. GEORGE instructed CW1 to go to the parking lot and await contact from her for a new meet location.

28. As a result of this telephone conversation, arrangements were made to have CW1 make a third crack cocaine purchase from GEORGE. Before CW1 met with GEORGE, agents of the ATF searched CW1 and his/her vehicle for the presence of money, firearms, and narcotics. This search was negative. In addition, agents equipped CW1 with a concealed recording and video device and they provided CW1 with $2,400 in previously recorded buy money.

29. On or about October 19, 2006, at approximately 11:03 a.m., CW1 received an incoming telephone call from GEORGE, which was not recorded. During this conversation, GEORGE told CW1 she was "ready" and asked CW1 if he/she had yet arrived in Chicago. CW1 told GEORGE he/she was in the area of 79th and Loomis Streets in Chicago and would be ready to make the purchase shortly. Again, GEORGE asked CW1 to contact her when CW1 was ready.

30. Moments later, CW1 was kept under surveillance as CW1 drove from the pre-arranged staging area to the area of 79th and Loomis in Chicago. Upon arriving, CW1 parked his/her car in a White Castle restaurant parking lot. CW1 called GEORGE again from this location and advised her where he/she was waiting. This conversation was not recorded. GEORGE told CW1 she would call him/her back again when she was in the area.

31. At approximately 12:13 p.m., CW1 reported to law enforcement that a dark colored Chevrolet van had parked on the east side of Loomis, just to the east of the White Castle parking lot. CW1 stated that GEORGE was in this vehicle and waving at CW1 in what he/she believed was a motion for him/her to follow her vehicle. Surveillance then watched CW1 as he/she moved his/her vehicle from the White Castle parking lot. At approximately 12:14 p.m., CW1 received an incoming call from GEORGE, which was not recorded. During this conversation, GEORGE told CW1 to follow her northbound on Loomis Street. Surveillance then observed the Chevrolet van pull into a parking space on Loomis Street between 79th and 78th Street in Chicago. CW1 parked his/her vehicle directly behind the van. Surveillance then observed CW1 exit his/her vehicle and walk to the Chevrolet van. CW1 reported that GEORGE, who had been seated in the front passenger seat, then moved from the front seat to a rear passenger seat of the van. This move allowed CW1 to enter the front passenger seat of the van. CW1 later stated that the driver of the van was the same African-American man who had accompanied GEORGE on September 20, 2006, during the first crack cocaine purchase with GEORGE.

32. Upon entering the vehicle, GEORGE handed CW1 two clear plastic baggies, each containing approximately two ounces of an off-white chunky substance. CW1 stated that, in turn, he/she handed GEORGE $2,400 in buy funds for the crack cocaine. In the conversation that

followed, GEORGE told CW1 that she had made up for the 6 grams she owed CW1 from the previous purchase on October 10, 2006.

33. At approximately 12:19 p.m., surveillance saw CW1 exit the van and walk directly back to his/her vehicle. Surveillance then observed CW1 drive out of the area and return to the staging location.

34. Upon arriving at this location, CW1 immediately turned over the suspect crack cocaine to agents. The suspect crack cocaine was off-white in color and chunky. Based on my training and experience, this suspect crack cocaine has the same characteristics of what I know to be crack cocaine. In addition, CW1 and his/her vehicle were searched for the presence of money, firearms, and narcotics. Those searches were negative.

35. The suspect crack cocaine delivered to CW1 by GEORGE on October 19, 2006 was subsequently analyzed and weighed by the DEA Laboratory. The suspect crack cocaine tested positive for the presence of cocaine base with a net weight of approximately 110.6 grams.

36.     Based on the foregoing, I believe that the actions of MARIA GEORGE were in violation of Title 21, United States Code, Section 841(a)(1), in that, on October 19, 2006, she knowingly and intentionally distributed a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance.

FURTHER AFFIANT SAYETH NOT.

_____
Laurie A. Jolley, Special Agent
Bureau of Alcohol, Tobacco and Firearms

Subscribed and sworn to before me this
14th day of November, 2008

_____
SUSAN E. COX
United States Magistrate Judge